UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00114-GNS-DW


CHRIS HARTMAN, et al.                                                    PLAINTIFFS


v.


JEREMY THOMPSON, et al.                                                  DEFENDANTS


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 17).

The motion has been fully briefed by the parties and is ripe for adjudication.  For the reasons

outlined below, the motion is **GRANTED**.

## I.        STATEMENT OF FACTS AND CLAIMS

This is a civil rights action under 42 U.S.C. § 1983, with pendent state law claims, arising

from Plaintiffs' arrest at the 2015 Kentucky Farm Bureau Federation ("KFB") country ham

breakfast.  KFB sponsors the breakfast annually at the Kentucky State Fair, at which members of

the Fairness Campaign, the American Civil Liberties Union of Kentucky, Inc. ("ACLU"), and

the Jefferson County Teachers Association ("JCTA") have regularly protested.  (Pls.' Resp.

Defs.' Mot. Summ. J. 2, 4-5, DN 22 [hereinafter Pls.' Resp.]).  These organizations oppose what

they term the "discriminatory policies" of KFB.  (Pls.' Resp. 2-4).

Prior to the 2015 breakfast, the Fairness Campaign issued a press release regarding its

stance on KFB's objectionable policies, as well as the group's intent to renew its protest

activities along with the ACLU and JCTA.  (Pls.' Resp. 5; Defs.' Mem. Supp. Mot. Summ. J. 6,

DN 17 [hereinafter Defs.' Mem.]; Defs.' Mot. Summ. J. Ex. 2, DN 17-2).  The press release

came to the attention of Defendant Jeremy Thompson ("Thompson"), who was the officer-in-charge of a two-week security detail for the Kentucky State Police ("KSP") at the State Fair. (Pls.' Resp. 5; Defs.' Mem. 12). Despite the short notice of the planned protest,[1] Thompson and fairgrounds personnel decided to allow the protest, but to confine it to a designated, flagged area. (Defs.' Mem. 12). The location was selected considering what would be "most appropriate for the protest . . . based on handicap accessible parking . . . ." (Defs.' Mem. 13).

On the morning of the 2015 breakfast, Thompson had a conversation (characterized alternatively as a "discussion" or "confrontation") with one of the protestors, Plaintiff Chris Hartman ("Hartman"), the director of the Fairness Campaign. (Hartman Dep. 7:13-20, 30:8-16, Sept. 23, 2016, DN 17-1). During their conversation, Thompson referred to the Fairness Campaign's press release and notified Hartman that his group's protest would be confined to an area designated for protestors, across from the entrance to the building where the breakfast was held. (Defs.' Mem. 6-7; Pls.' Resp. 7). In response, Hartman stated that he was going to "ramp up" the group's activities[2] until KFB changed its policies. (Defs.' Mem. 7). Thompson told Hartman that "'we do not want to arrest you in here. Please do not make a scene and protest inside the venue.' And [Hartman] said, 'I'm going to do what I have to do.'" (Thompson Dep. 84:22-85:1, Sept. 14, 2016, DN 17-5).

Plaintiffs and their fellow protestors complied with the request to move their protest to the designated area, but claim that other individuals who "held out signs and passed out

---

[1] Kentucky Administration Regulations applicable to the Kentucky Fair and Exposition Center permit several forms of protest there within certain parameters, but require groups intending to conduct such activities to apply to its Executive Director between 72 hours and 2 weeks in advance. *See* 303 KAR 1:080 §§ 1-2.

[2] The protest at the 2014 breakfast included 24 protestors wearing bright, matching t-shirts listing KFB's discriminatory policies, as well as a silent protest by individuals wearing the shirts near the buffet lines and later in front of the dais during the program. (Pls.' Resp. 5; Defs.' Mem. 5-7).

information regarding various commercial and political issues" were allowed to protest. (Pls.' Resp. 7). Thompson indicated that this distinction was due to the fact that only the Fairness Campaign group designated themselves as "protestors" with the fairgrounds. (Thompson Dep. 49:13-52:25).

Although the group originally planned to silently protest within the event space as they had the previous year, following Hartman's conversation with Thompson they decided instead to stand silently at their tables for one minute during the first speech. (Pls.' Resp. 8; Defs.' Mem. 7). Following the opening invocation of the breakfast, the members of the protest group rose from their seats and stood at the three tables at the back of the auditorium where they had been seated. (Pls.' Resp. 8-9; Defs.' Mem. 15-16).

There is some dispute about what transpired next. Plaintiffs maintain that none of the individuals were told to sit down or leave and that within three to five seconds of standing Hartman had been seized by the arms, placed under arrest, and escorted from the venue. (Pls.' Resp. 9). Thompson testified that he "'personally walked over to Chris [Hartman] and said, "Chris, take your seat. I've already warned you about protesting inside here.' And Chris was silent. He wouldn't answer me.'" (Thompson Dep. 107:17-20). Defendant Jason Drane ("Drane") testified that he and other troopers went over to the tables and asked the protestors to sit down. (Drane Dep. 9:9-10:7, Sept. 14, 2016, DN 17-8). After being escorted to the hallway outside the breakfast room, Hartman was placed in handcuffs and arrested. (Defs.' Mem. 18; Pls.' Resp. 9). Hartman testified that, as he was looking back at his fellow protesters, he was jerked forward and "dead dropped," letting his legs go limp, and was dragged from the building. (Hartman Dep. 41:21-42:6). Drane claims that Hartman picked his feet up and had to be "pack[ed] out" by the troopers, which Drane considered to be disorderly conduct. (Pls.' Resp.

10; Drane Dep. 15:1-20; Defs.' Mem. 18-19). Drane arrested Hartman and charged him with failure to disperse and disorderly conduct in the second degree. (Pls.' Resp. 9-10).

Thompson testified that he then reentered the room and, finding that the other individuals were still standing, walked up to one of the tables and said, "[f]olks, it's time to leave." (Thompson Dep. 109:8-11). Thompson stated that all the protestors except for two complied with his order, but noted:

> The other two young ladies refused to walk out. I specifically walked up to one of them – and I don't recall which one – and said, "It's time to go." She said, "I'm not leaving." She said, "I'm not leaving" two or three times in my presence, and then she was arrested.

(Thompson Dep. 109:15-23).

Plaintiff Sonja DeVries ("DeVries") testified that following Hartman's arrest Defendant Brian Hill ("Hill") approached her and told her she had to leave. (DeVries Dep. 24:21-23, Sept. 23, 2016, DN 17-3). DeVries told Hill she was getting ready to leave but was waiting for her friends, and she was then placed under arrest, handcuffed, and escorted from the room by Hill. (DeVries Dep. 24:12-25:12; Hill Dep. 9:4-6, Sept. 14, 2016, DN 17-7). Thompson and Hill arrested DeVries and charged her with failure to disperse. (Pls.' Resp. 10).

Plaintiff Carla F. Wallace ("Wallace") claims that after Hartman's arrest troopers approached her and told her to leave, but that before she could do so she was arrested and removed from the building. (Wallace Dep. 37:6-17, Oct. 5, 2016, DN 17-4). Thompson arrested Wallace and charged her with failure to disperse. (Pls.' Resp. 10).

The day before trial in state court on the disorderly conduct and failure to disperse charges, the Jefferson County Attorney moved to dismiss all charges against Plaintiffs; the motions were granted and all charges were dismissed. (Pls.' Resp. 11). Plaintiffs then filed suit in Jefferson Circuit Court alleging four separate 42 U.S.C. §§ 1983 and 1988 claims: false

arrest, malicious prosecution, and two claims under the First Amendment (for violation of free speech and retaliation). In addition, they assert state law tort actions for wrongful arrest, malicious prosecution, and battery. Defendants removed the case to this Court.

## II.  JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because a federal question is presented and has supplemental jurisdiction over Plaintiffs' state-law claims arising from the same case or controversy pursuant to 28 U.S.C. § 1367.

## III.  STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support

of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

This analysis is slightly altered for questions of qualified immunity:  "[e]ven if there is a material fact in dispute, summary judgment is appropriate if the Court finds that—viewing the facts in the light most favorable to the plaintiff—the plaintiff has failed to establish a violation of clearly established constitutional law."  *Smith v. Peyman*, 93 F. Supp. 3d 738, 744 (E.D. Ky. 2015) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)).

## IV.    DISCUSSION

### A.    Section 1983 False Arrest Claim

First, Defendants seek summary judgment on Plaintiffs' false arrest claim.  Defendants argue that they are entitled to judgment on both the merits of the claim and the defense of qualified immunity.  (Defs.' Mem. 38-48).

#### 1.    *Merits*

To make a viable claim under 42 U.S.C. § 1983, a claimant must allege that he or she was deprived of a right, privilege, or immunity secured by the U.S. Constitution or federal law by one acting under color of state law while causing the deprivation.  *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-56 (1978); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005)).  "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff."  *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) (citation omitted). Officers have probable cause to make an arrest when, "at the moment [of] the arrest," they possess    knowledge    of    "reasonably    trustworthy    information"    regarding    "facts    and

circumstances . . . sufficient to warrant a prudent man in believing that [the arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (citations omitted).

"In the [Section] 1983 context, the question of whether probable cause existed is left for the jury, unless there is only one reasonable determination possible." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 581 (6th Cir. 2003) (citations omitted); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). *Crockett* involved a series of arrests made following the report of a rape on the campus of Cumberland College. The court discussed at length the facts giving rise to a finding of probable cause for the arrests at issue. *Id.* at 582-83. Critically, all facts creating probable cause in *Crockett* were garnered from the victim and an eyewitness, with no contradiction from any of the arrestees prior to their arrests. *Id.* The court thus concluded under those facts that no reasonable jury could find the officer in question lacked probable cause for the arrests. *Id.* at 583.

As DeVries testified, when she was instructed to leave by an officer she "responded that [she] was getting ready to leave and that [she] was waiting for [her] friends at the other table." (DeVries Dep. 24:21-23). Because DeVries admits that she failed to follow the officer's instructions to leave (replying instead that she was waiting on her friends), the arresting officer had probable cause to believe DeVries was committing the offense of failing to disperse in violation of KRS 525.160.[3] *Beck*, 379 U.S. at 91. DeVries was participating in the protest with

---

[3] KRS 525.160 provides:

> A person is guilty of failure to disperse if [she] participates with two (2) or more persons in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance or alarm, and intentionally refuses to disperse when ordered to do so by a peace officer or other public servant engaged in executing or enforcing the law.

several other participants; they collectively had obstructed the prior year's breakfast and had promised to ramp up their activities shortly before DeVries—by her own admission—was told to disperse and failed to do so.

By contrast, a factual dispute exists regarding whether Hartman and Wallace were ordered to disperse before they were arrested. Hartman and Wallace both insist they were arrested without any warning. (Hartman Dep. 40:11-25; Wallace Dep. 37:6-17). Regardless, the U.S. Supreme Court has eliminated the requirement "that the offense establishing probable cause [] be 'closely related' to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest . . . ." *Devenpeck v. Alford*, 543 U.S. 146, 153-54 (2004).

> Instead, an arrest is proper as long as the facts known to the officer at the time of arrest establish probable cause to believe that the individual was committing an offense. It is irrelevant whether the officer had probable cause to arrest for the specific offense that he identifies as the basis for the arrest at the time of the incident.

*Warren v. Lexington-Fayette Urban Cty. Gov't Police Dep't*, No. 5:16-140-DCR, 2017 U.S. Dist. LEXIS 104225, at *10-11 (E.D. Ky. July 6, 2017) (internal citation omitted) (citing *Devenpeck*, 543 U.S. at 153-54).

Plaintiffs were charged with failure to disperse in violation of KRS 525.160. Hartman and Wallace deny they were ordered to disperse before their arrest. However, the arresting officers did have good cause to believe that both were engaged in activity intended to disrupt the breakfast in violation of KRS 525.150, which provides that "[a] person is guilty of disrupting meetings and processions . . . when, with intent to prevent or disrupt a lawful meeting, procession, or gathering, he or she does any act tending to obstruct or interfere with it physically or makes any utterance, gesture, or display designed to outrage the sensibilities of the group."

---

KRS 525.160(1). Failure to disperse is a Class B misdemeanor. KRS 525.160(2).

KRS 525.150(1).  It is undisputed that the protestors, led by Hartman and including both Wallace and DeVries, attended the breakfast program wearing brightly colored shirts emblazoned with slogans antithetical to KFB's policies.  Having vowed to escalate their protest from the previous year when cautioned against demonstrating inside the event, the actions of Plaintiffs' group standing in unison[4] certainly provided a reasonable basis for the security detail to believe the protestors intended to disrupt the breakfast program.  Under these circumstances, Thompson and the other troopers had probable cause to believe that Plaintiffs were violating the law—albeit a different law than cited at the time of arrest.  The Court therefore finds that Defendants had probable cause to arrest Hartman, DeVries, and Wallace under KRS 525.150.  Defendants had an unquestionable factual basis to believe that Plaintiffs intended to disrupt the meeting by their protest at the breakfast event, as they had the year before.  Defendants are thus entitled to summary judgment as to each Plaintiff's claim of false arrest under Section 1983.

### 2. *Qualified Immunity*

Separate from the merits of the wrongful arrest claims is the question of whether Defendants are entitled to the protection of qualified immunity against any or all of Plaintiffs' claims.  (Answer 3-4, DN 4).  The doctrine of qualified immunity shields government officials from individual liability for claims arising from their performance of discretionary functions as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *White v. Pauly*, 137 S. Ct. 548, 551 (2017).  Since qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis

---

[4]  Although Plaintiffs claim they intended to stand silently at their table, they never communicated this intention to any of the Defendants.  (Pls.' Resp. 8; Defs.' Mem. 7-8).

deleted); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." (citations omitted)).

### a.  Discretionary versus Ministerial Function

The Court must first determine whether the Defendants' acts constituted discretionary or ministerial functions. Defendants argue that the challenged actions occurred in their performance of a discretionary function because "when the protestors stood at the ham breakfast on August 27, 2015, the officers exercised their discretion and made a good faith judgment call to remove the protestors from the room."[5]  (Defs.' Mem. 42 (citing *Yanero*, 65 S.W.3d 510; *Haney*, 311 S.W.3d 235; *Gaither*, 447 S.W.3d 628).  Plaintiffs did not address the issue of discretionary versus ministerial function in their response.

By way of distinguishing discretionary from ministerial functions, "[a] law that fails to specify the precise action that the official must take in each instance creates only discretionary authority; and that authority remains discretionary however egregiously it is abused."  *Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984) (citation omitted).  "The courts also tend to construe the term 'discretionary' very liberally in an effort to promote the policies behind immunity."  33 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8320 (1st ed. 2017). The Supreme Court has noted that it has "been unwilling to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of various

---

[5]  The Kentucky Supreme Court has defined "a ministerial act as 'one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  *Gaither v. Justice & Pub. Safety Cabinet*, 447 S.W.3d 628, 633 (Ky. 2014) (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)).  The *Gaither* decision contrasts these with discretionary acts, which are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment" and "'necessarily require the exercise of reason in the adaptation of means to an end . . . .'"  *Id.* (quoting *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010)).

officials' duties or the precise character of the particular rights alleged to have been violated." *Anderson v. Creighton*, 483 U.S. 635, 643 (1987). Examples of discretionary functions that have been entitled to qualified immunity include arresting a suspect based on a reasonable mistake as to probable cause and a warrantless entry and search of a residence incident to arrest, whereas ministerial duties include training and supervising employees as to established duties and policies. *Hunter*, 502 U.S. at 228-29; *Pearson v. Callahan*, 555 U.S. 223, 243-45 (2009); *Hedgepath v. Pelphrey*, 520 F. App'x 385, 391-92 (6th Cir. 2013).

Addressing their discretionary authority, Defendants' motion notes that the police detail at the Kentucky State Fair was tasked with "general law enforcement duties . . . including security, accidents, theft reports, missing children, lost children," and further cites KRS 247.140, .145, .150, and .160, which describe the powers of the State Fair Board that include provisions for contracting with the KSP to police the fairgrounds and exhibition center. (Defs.' Mem. 12, 25-26). Defendants also recite that KRS 431.015(1)(b)(3) allows police officers to make an arrest without a warrant for a misdemeanor committed in their presence involving refusal to follow officers' reasonable instructions. (Defs.' Mem. 42). KRS 431.005(1)(d) further provides that a police officer may make an arrest "without a warrant when a misdemeanor, as defined in KRS 431.060, has been committed in his or her presence . . . ."

Given the discretionary language of KRS 431.015(1)(b)(3) and 431.005(1)(d), and the misdemeanor nature of both KRS 525.160 and KRS 525.150, the Court is satisfied that Defendants have adequately argued facts, as discussed above, to establish they acted within the scope of their discretionary authority in effecting Plaintiffs' arrests. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citation omitted). Even if Plaintiff had an arguable defense to any of the elements of the crimes charged or for the similar infraction for disrupting a public

meeting, Defendants' actions in removing Plaintiffs from the breakfast and arresting them appear to have been a good-faith judgment call under uncertain circumstances.

### b. *Saucier* Factors

Defendants having established facts supporting qualified immunity, "the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct." *Id.* (citation omitted). The two-part analysis used is taken from *Saucier*, under which the Court must decide whether the facts show a violation of a constitutional right which was "clearly established" at the time of Defendants' alleged misconduct. *Saucier*, 533 U.S. at 200-01. The Supreme Court noted that the trial court has discretion to "decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. "If the undisputed facts show that defendant's conduct, as a matter of law, did not violate clearly established legal rights, then the district court must grant the defendant summary judgment on the basis of qualified immunity." *Poe v. Haydon*, 853 F.2d 418, 425 (6th Cir. 1988) (citation omitted). Summary judgment is not appropriate, however, where there is a genuine dispute of material fact involving an issue on which immunity turns, or "if the undisputed facts show that the defendant's conduct did indeed violate clearly established rights." *Id.* at 426 (citation omitted).

### i. Clearly Established Right

The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see Wilson v. Layne*, 526 U.S. 603, 614 (1999) (stating that the inquiry turns on the "objective legal reasonableness of the action, assessed in light of the

legal rules that were clearly established at the time it was taken." (internal quotation marks omitted) (citation omitted)). Both the Sixth Circuit and Supreme Court have a long history of holding that warrantless arrests must be supported by probable cause. *See Crockett*, 316 F.3d at 580 ("[I]t is well established that any arrest without probable cause violates the Fourth Amendment." (citations omitted)); *see also Baker v. McCollan*, 443 U.S. 137, 142-43 (1979); *Donovan v. Thames*, 105 F.3d 291, 297-98 (6th Cir. 1997). Given this history, the right to be free from warrantless arrest absent probable cause is clearly established, meeting the first prong of the *Saucier* analysis.

### ii.       Violation of Clearly-Established Rights

The second prong of the *Saucier* analysis involves a determination of whether a violation of such clearly-established rights took place. The Supreme Court has "recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson*, 483 U.S. at 641 (citing *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986)). The relevant question is therefore the "objective (albeit fact-specific) question whether a reasonable officer could have believed" Plaintiffs' warrantless arrests "to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Anderson*, 483 U.S. at 641. Given the undisputed fact that DeVries refused to leave when directed to do so, and the Court's determination of the existence of probable cause as to all Plaintiffs for their attempted disruption of the breakfast meeting, Plaintiffs have failed to "establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct."

*Gardenhire*, 205 F.3d at 311 (citation omitted); *Smith*, 93 F. Supp. 3d. at 745. Under *Gardenhire*'s burden-shifting structure, Defendants are therefore entitled to summary judgment on Plaintiffs' claim of false arrest under Section 1983, whether considered on the merits or under a defense of qualified immunity.

### B. First Amendment Free Speech Violation

Defendants have also moved for summary judgment on the Plaintiffs' claim of a violation of their free speech rights. (Defs.' Mem. 20-32). As outlined below, they are entitled to summary judgment on the merits of that claim, as well as on the defense of qualified immunity.

#### 1. *Merits*

First Amendment claims for free speech violations are measured by a three-part analysis: (1) whether the speech is protected; (2) the nature of the forum at which the speech occurred; and (3) whether the government's restriction on speech satisfies the relevant forum's associated constitutional standard. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985); *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 559 (6th Cir. 2007). Because Defendants do not contest the first prong,[6] the Court will consider the remaining requirements in determining whether Defendants are entitled to summary judgment on this claim.

#### a. Type of Forum

The Supreme Court has recognized four types of fora: nonpublic, public, designated public, and limited public. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469-70 (2009); *Miller v. City of Cincinnati*, 622 F.3d 524, 534-35 (6th Cir. 2010). Defendants, relying on other

---

[6] In particular, Defendants state that they do not dispute Plaintiffs' free speech rights, or that "expressive activities, such as wearing colorful t-shirts with slogans or standing in unison, are considered 'speech' for purposes of the First Amendment." (Defs.' Mem. 21 (citing *United States v. Grace*, 461 U.S. 171 (1983))).

state fair cases, contend that the area where the pre-breakfast protest took place—within the fairgrounds but outside the South Wing of the Exhibition Center where the breakfast was held—constitutes a limited public forum. (Defs.' Mem. 23-25, 27-32). Plaintiffs' argument regarding the forum is somewhat unclear, but maintains that the pre-breakfast protest took place "in the street surrounding the fairgrounds, the parking lot and on the sidewalks-traditional public fora." (Pls.' Resp. 20-21 (citing *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983)). Plaintiffs cite no evidence to support this statement, and the record does not appear to include any maps or diagrams to illustrate whether the protest took place within the boundary of the fairgrounds (where paid admission to the fair was required), or on publically-accessible space within the fairgrounds but outside the fair. As such, Plaintiffs have failed to meet their burden under Fed. R. Civ. P. 56(c), and the limited public forum analysis will be applied.

### b. Constitutionality of Restrictions

A government entity may "create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Summum*, 555 U.S. at 470 (citing *Perry Ed. Ass'n*, 460 U.S. at 46 n.7). In such a limited public forum, the government may restrict speech "as long as the restrictions do 'not discriminate against speech on the basis of viewpoint' and are 'reasonable in light of the purpose served by the forum.'" *Miller*, 622 F.3d at 535 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001)).

Plaintiffs' argument against the restrictions when considered as a limited public forum incorrectly states the standard as requiring content neutrality (the relevant analysis for time, place, or manner restrictions of a public forum, which is a higher standard than viewpoint neutrality. (Pls.' Resp. 21-22 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))). The Supreme Court has observed "a distinction between . . . content discrimination, which may

be permissible if it preserves the purposes of that limited forum, and . . . viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995) (citation omitted). Defendants likewise misapply the content neutrality versus viewpoint neutrality distinction.[7] (Defs.' Mem. 29-30).

Regarding viewpoint neutrality, the Supreme Court has noted that "[t]he principle that has emerged from our cases 'is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). In *Lamb's Chapel*, the Court found that exclusion from a nonpublic forum (to which applies the same viewpoint neutrality and reasonability analysis as limited public fora) on the basis of religious viewpoint was not viewpoint neutral. *Id.* at 393-94. The Supreme Court noted that there was no "indication in the record before us that the application to exhibit the particular film series involved here was, or would have been, denied for any reason other than the fact that the presentation would have been from a religious perspective." *Id.* This marks an important distinction to the present case, as there *is* evidence in the record to indicate a viewpoint-neutral rationale for the restriction— namely, Thompson's testimony that the designated space at issue would have applied to anyone who registered as a protestor. (Thompson Dep. 49:13-52:5). Although Plaintiffs claim other protestors were present outside the designated area, Plaintiffs point to no evidence in the record

---

[7] Additionally, Defendants' argument in relation to the relevant statutory and administrative regulations that would have, on their face, barred Plaintiffs' protest is unpersuasive. (Defs.' Mem. 25-27). Allowing the protest despite the Fairness Campaign's failure to follow the letter of such regulations does not entitle the state to a free pass; any restrictions on speech must still meet the constitutional requirements for restrictions in a limited public forum.

to support a finding that any other group of protestors who registered would not have been directed to the same designated area.

It appears that Thompson's testimony is the only evidence in the record that bears on the issue of viewpoint neutrality. The lack of any genuine dispute as to any material fact makes this claim ripe for summary judgment, which is granted in Defendants' favor.

## 2. *Qualified Immunity*

Even if Defendants were not entitled to summary judgment on the merits of Plaintiffs' free speech violation claim, Defendants would be entitled to the protection of qualified immunity for the reasons discussed below.

### a. Discretionary versus Ministerial Function

Qualified immunity only applies to the exercise of discretionary functions. *Harlow*, 457 U.S. at 818 (citations omitted); *White*, 137 S. Ct. at 551. While Defendants' motion includes a recitation of facts surrounding the decision to constrain the Fairness Campaign's protest and the troopers' execution of that constraint, and gives an outline of their duties at the State Fair, Defendants did not specifically address whether such conduct constituted a discretionary or ministerial function. (Defs.' Mem. 6-8, 12-13, 15, 25-27). Plaintiffs likewise did not address the issue of discretionary versus ministerial function in their response.

Given the lack of a precise action required of Defendants in fulfilling their "general law enforcement duties" and the relevant statutes discussed above, it appears that Defendants acted within the scope of their discretionary authority during the incident in question. *See Davis*, 468 U.S. at 196 n.14. Their obligations were not spelled out in fixed detail. Instead, as noted above, Defendants were responsible for general law enforcement at the fair, with all its myriad tasks and duties. (Defs.' Mem. 12, 25-26, noting KSP was charged with "general law enforcement

duties . . . including security, accidents, theft reports, missing children, lost children," and citing KRS 247.140, .145, .150, and .160, which describe the powers of the State Fair Board, including provisions for contracting with the KSP to police the fairgrounds and exhibition center). Accordingly, the burden shifts to Plaintiffs "to establish that the defendant[s'] conduct violated a right so clearly established that any official in [their] position would have clearly understood that [they were] under an affirmative duty to refrain from such conduct." *Gardenhire*, 205 F.3d at 311 (citation omitted).

### b.    *Saucier* Factors

#### i.    Clearly Established Right

The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see Wilson*, 526 U.S. at 614. The same limited public forum analysis discussed above applies in the context of qualified immunity, as the right to be free from unreasonable or viewpoint-discriminatory restrictions in a limited public forum is likewise clearly established under Supreme Court and Sixth Circuit precedent.

#### ii.    Violation of Clearly Established Right

The second prong of the *Saucier* analysis addresses whether a violation of clearly-established rights took place. Under the limited public forum analysis, Plaintiffs fail to cite any evidence in the record to indicate that the protest took place in a public, rather than a limited public, forum. Thompson's testimony indicates that the restriction imposed was viewpoint-neutral, and would have applied equally to all protestors. Even construing the evidence most favorably to them, Plaintiffs have thus failed to "establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he

was under an affirmative duty to refrain from such conduct." *Crockett*, 316 F.3d at 580 (citation omitted); *Gardenhire*, 205 F.3d at 311 (citation omitted). Under *Gardenhire*'s burden-shifting structure, Defendants are therefore entitled to summary judgment on the basis of qualified immunity as to Plaintiffs' claim for First Amendment free speech violation.

### C.    First Amendment Free Speech Retaliation

Defendants also argue that the Court should dismiss Plaintiffs' free speech retaliation claim. (Defs.' Mem. 32-37). The Court will consider both the merits of the claim, as well as whether the defense of qualified immunity applies.

#### 1.    *Merits*

To make out a claim for retaliation for the exercise of First Amendment rights, Plaintiffs must show that: "(i) [they were] participating in a constitutionally protected activity; (ii) [] [Defendants'] action injured [them] in a way likely to chill a person of ordinary firmness from further participation in that activity; and (iii) [] [Plaintiffs'] constitutionally-protected activity was a 'motivating factor' behind [Defendants'] actions." *Smith*, 93 F. Supp. 3d at 748 (internal quotation marks omitted) (internal citations omitted) (citation omitted). A successful claim for First Amendment retaliation must also plead and prove the absence of probable cause. *Hartman v. Moore*, 547 U.S. 250, 265-66 (2006)); *see also Marcilis v. Twp. of Redford*, 693 F.3d 589, 604 (6th Cir. 2012). Officers have probable cause to make an arrest when, "at the moment [of] the arrest," they possess knowledge of "reasonably trustworthy information" regarding "facts and circumstances . . . sufficient to warrant a prudent man in believing that [the arrestee] had committed or was committing an offense." *Beck*, 379 U.S. at 91 (citations omitted).

As discussed above, the Court has determined the existence of adequate probable cause as to all Plaintiffs with respect to their disruption of the KFB breakfast. Thus, Plaintiffs have

failed to adequately plead a claim of First Amendment retaliation, and Defendants' motion for summary judgment is granted on the merits.

### 2. *Qualified Immunity*

Even if Defendants were not entitled to summary judgment on the merits of Plaintiffs' free speech retaliation claim, Defendants would be entitled to the protection of qualified immunity.

### a. Discretionary versus Ministerial Function

Defendants argue that the challenged actions occurred in their performance of a discretionary function because, "when the protestors stood at the ham breakfast on August 27, 2015, the officers exercised their discretion and made a good faith judgment call to remove the protestors from the room." (Defs.' Mem. 42). Plaintiffs did not address the issue of discretionary versus ministerial function in their response.

As discussed previously, Defendants have adequately argued facts to suggest they acted within the scope of their discretionary authority, and the burden thus shifts to Plaintiffs "to establish that the defendant[s'] conduct violated a right so clearly established that any official in [their] position would have clearly understood that [they were] under an affirmative duty to refrain from such conduct." *Gardenhire*, 205 F.3d at 311 (citation omitted).

### b. *Saucier* Factors

### i. Clearly Established Right

The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see Wilson*, 526 U.S. at 614. As both the Sixth Circuit and Supreme Court have a long history of holding that warrantless arrests must be supported by

probable cause, the right to be free from warrantless arrest absent probable cause meets the first prong of the *Saucier* analysis. *See Crockett*, 316 F.3d at 580; *see also Baker*, 443 U.S. at 142-43.

### ii. Violation of Clearly Establish Right

The second prong of the *Saucier* analysis is whether a violation of such clearly-established rights took place. Again, Plaintiffs have failed to "establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct." *Gardenhire*, 205 F.3d at 311 (citation omitted). The events unfolding at the breakfast program were fluid and the decision to remove the protesting Plaintiffs from the event constituted a judgment call which cannot, in hindsight, be said to be a violation of Plaintiffs' clearly-established rights. Under *Gardenhire*'s burden-shifting structure, Defendants are therefore entitled to summary judgment on Plaintiffs' claim of free speech retaliation under the First Amendment, whether considered on the merits or under a defense of qualified immunity.

### D. Section 1983 Malicious Prosecution

Defendants also seek summary judgment on Plaintiffs' last federal claim, that of malicious prosecution. (Defs.' Mem. 38-48). Both the merits of the claim and the defense of qualified immunity warrant the dismissal of this claim.

### 1. Merits

A claim for malicious prosecution under federal law will lie if the plaintiff can prove, "at a minimum, that there is no probable cause to justify an arrest or a prosecution." *Voyticky*, 412 F.3d at 675 (citing *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003)). The elements of a malicious prosecution claim under the Fourth Amendment are: (1) "that a criminal prosecution was initiated against the plaintiff and that the defendant 'ma[d]e, influence[d], or

participate[d] in the decision to prosecute'"; (2) "that there was a lack of probable cause for the criminal prosecution"; (3) "that, 'as a consequence of a legal proceeding,' the plaintiff suffered a 'deprivation of liberty' . . . apart from the initial seizure"; and (4) that "the criminal proceeding must have been resolved in the plaintiff's favor." *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010) (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007)).

"To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (quoting *Sykes*, 625 F.3d at 308 n.5). There must be "some element of blameworthiness or culpability in the participation," as "truthful participation in the prosecution decision is not actionable." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). "It is absolutely clear, however, that an officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's *truthful* materials." *Sykes*, 625 F.3d at 314 (emphasis in original) (citations omitted). In *Miller v. Maddox*, 866 F.3d 386 (6th Cir. 2017), the Sixth Circuit found an officer participated in the decision to prosecute where, following the plaintiff's arrest, the officer swore as a "prosecutor" in an affidavit for an arrest warrant providing details of the charge, and testified to the same facts as the sole witness during a preliminary hearing that led to the court's determination to turn the case over to the grand jury. *See id.* at 390-91.

Plaintiffs claim only that their prosecutions "were initiated by the citations and arrests issued by the defendants against the plaintiffs." (Pls.' Resp. 17). The Complaint alleges that:

Defendants' conduct violated Plaintiffs' rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and

Sections 2 and 10 of the Kentucky Constitution. Plaintiffs were subjected to malicious prosecution when they were charged falsely with offenses for which there was no probable cause and which were ultimately terminated in their favor. No reasonable officer would have placed such charges against Plaintiffs and such charges were placed against them to punish them for exercising their constitutionally protected free speech rights.

(Compl. ¶ 35, DN 1-2). Plaintiffs have alleged no facts relating to Defendants' participation in the decision to prosecute other than Plaintiffs' initial arrest. Defendants' motion for summary judgment is therefore granted on the merits as to Plaintiffs' claim of malicious prosecution under Section 1983.

### 2. *Qualified Immunity*

Even if Defendants were not entitled to summary judgment on the merits of Plaintiffs' Section 1983 malicious prosecution claim, Defendants would be entitled to the protection of qualified immunity.

### a. **Discretionary versus Ministerial Function**

As discussed above, Defendants have adequately argued facts to suggest they acted within the scope of their discretionary authority, and the burden thus shifts to Plaintiffs "to establish that the defendant[s'] conduct violated a right so clearly established that any official in [their] position would have clearly understood that [they were] under an affirmative duty to refrain from such conduct." *Gardenhire*, 205 F.3d at 311 (citation omitted).

### b. *Saucier* **Factors**

Applying the first *Saucier* factor to this claim, the Fourth Amendment clearly establishes the right to be free from malicious prosecution. *King v. Harwood*, 852 F.3d 568, 583 (6th Cir. 2017). As to the second factor and as discussed above regarding free speech retaliation, Plaintiffs have failed to "establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an

affirmative duty to refrain from such conduct." *Gardenhire*, 205 F.3d at 311 (citation omitted).

Under *Gardenhire*'s burden-shifting structure, Defendants are therefore entitled to summary

judgment on Plaintiffs' claim of malicious prosecution under Section 1983, whether considered

on the merits or under a defense of qualified immunity.

**E.**     **State Law Claim for False Arrest**[8]

Turning to Plaintiffs' state law claims, the Court will first address false arrest.  (Compl.

¶¶ 28-29, 36-38).  In moving for summary judgment, Defendants seek dismissal of this claim.

(Defs.' Mem. 48-49).

**1.**     *Merits*

"False imprisonment is the intentional confinement or instigation of confinement of a

plaintiff of which confinement the plaintiff is aware at the time.  And false arrest is a term that

describes the setting for false imprisonment when it is committed by an officer or by one who

claims the power to make an arrest." *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007) (internal

quotations omitted) (alteration omitted) (citation omitted).  A police officer is liable for false

arrest unless the officer enjoys a privilege or immunity to detain an individual.  *Id.*  One such

privilege is "an arrest without a warrant in which the officer has 'probable cause, that is,

reasonable objective grounds to believe that a crime was committed and that the plaintiff

committed it.'"  *Id.* (citations omitted).

Very recently, our sister court predicted that Kentucky would adopt the holding of

*Devenpeck*, and concluded that "an officer has probable cause to arrest as long as the facts

available to him establish probable cause for *any* offense, regardless of whether there is probable

cause to arrest for the specific offense that the officer subjectively identified as the reason for the

_____

[8] The term "false arrest" is used here to comport with relevant Kentucky tort law, but refers to
Plaintiffs' claim of "wrongful arrest."  (Compl. ¶¶ 36-38).

arrest." *Warren*, 2017 U.S. Dist. LEXIS 104225, at *16-17 (emphasis in original). In this instance, it makes little sense to hold the officers subject to liability for arresting Plaintiffs on charges of failure to disperse, when a closely-related charge of disrupting a public meeting may have been more appropriate and avoided the factual dispute over whether the officers directed Plaintiffs to disperse before arresting them. In this context, it seems far preferable to afford Defendants the latitude of considering any chargeable offense supported by the facts, as in *Devenpeck*. Thus, given the Court's determination that probable cause existed as to all three Plaintiffs with respect to disrupting the KFB breakfast in violation of KRS 525.150, Defendants are entitled to summary judgment on the merits of Plaintiffs' state law false arrest claim.[9]

### 2. *Qualified Official Immunity*[10]

"'Official immunity' is immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions. It rests not on the status or title of the officer or employee, but on the function performed." *Yanero*, 65 S.W.3d at 521 (citing *Salyer v. Patrick*, 874 F.2d 374 (6th Cir. 1989)). Qualified official immunity "affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Id.* at 522 (citation omitted). "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* (internal citations omitted). The good faith requirement represents a distinction with federal qualified

---

[9] Plaintiffs attempted to address this claim in their Supplemental Brief, as ordered by the Court as to their state law claims of assault and battery; the Court will not consider such additional arguments made as to false arrest, as outside the scope of the Court's Order. (*See* Order, DN 28; Pls.' Supp. Br. 2-5, DN 29).

[10] The Kentucky doctrine parallel to the federal "qualified immunity" concept is known as "qualified official immunity." *See Yanero*, 65 S.W.3d at 521.

immidity, in that "Kentucky law adopts both an objective and a subjective approach to qualified immunity." *Smith*, 93 F. Supp. 3d at 751 (citing *Phat's Bar & Grill v. Louisville Jefferson Cty. Metro Gov't*, 918 F. Supp. 2d 654, 663 (W.D. Ky. 2013)).

### a. Discretionary versus Ministerial Function

"The essence of a discretionary power is that the person or persons exercising it may choose which of several courses will be followed. The power to exercise an honest discretion necessarily includes the power to make an honest mistake of judgment." *Franklin Cty. v. Malone*, 957 S.W.2d 195, 201 (Ky. 1997) (citing *Commonwealth ex rel. Meredith v. Frost*, 172 S.W.2d 905 (Ky. 1943)). As discussed above, the Court is satisfied that the discretionary function element is satisfied.

### b. Within Scope of Authority

Given that the Court has determined above that Defendants acted within the scope of their discretionary authority, the Court finds that the same analysis is applicable here, and Defendants acted within the scope of their authority under KRS 431.005.

### c. Good Faith

Drawing from the U.S. Supreme Court's discussion of the issue, the Kentucky Supreme Court has held that qualified official immunity would be defeated if an official "'*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury . . . .'" *Yanero*, 65 S.W.3d at 523 (alterations in original) (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)).

> Thus, in the context of qualified official immunity, "bad faith" can be predicated on a violation of constitutional, statutory, or other clearly established right which

a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive. Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.

*Id.* (internal citation omitted) (citation omitted).

Plaintiffs have failed to meet their burden of establishing that Defendants violated their clearly established rights. Further, Plaintiffs make no claim of evidence of any subjective malice or ill will by Defendants toward Plaintiffs or the cause they championed. Instead, the evidence reflects that Hartman was warned against protesting inside the breakfast event, that he promised to "ramp things up," and that Plaintiffs were arrested for protesting in defiance of Thompson's admonition. Plaintiffs have made no showing that their arrest was anything other than a judgment call executed in good faith by Defendants which appears to have been objectively reasonable in light of the group's disruption of the prior year's event and Hartman's promise of more to come. Defendants are therefore entitled to qualified official immunity against Plaintiffs' state law false arrest claims.

## F. <u>State Law Claims for Assault & Battery</u>

Defendants also seek summary judgment on Plaintiff's state-law assault and battery claims, though the same were not specifically addressed in their motion.[11] The Court ordered supplemental briefing on these claims, which were submitted for review. (Order, DN 28; Pls.' Supp. Br., DN 29; Defs.' Supp. Br., DN 30). As discussed below, the motion will be granted as to these claims, on the basis that Plaintiffs have failed to adequately support their claim of

---

[11] Defendants' only mention of Plaintiffs' battery claim appeared in their argument for qualified immunity. (Defs.' Mem. 38).

assault, and their claim of battery as to two of the Plaintiffs, and on the basis of qualified official immunity as to the remaining plaintiff's battery claim.

### 1. *Merits*

Under Kentucky law, "[a]ssault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching." *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. App. 2001) (citation omitted). Contact is unlawful if it is unwanted or if there is no consent to it. *See Andrew v. Begley*, 203 S.W.3d 165, 171 (Ky. App. 2006). "However, a police officer is privileged, under certain circumstances, to use force in effecting an arrest." *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008). This privilege extends to the use of physical force by an officer in making an arrest which he believes lawful, so long as he believes such force is necessary to effect the arrest and makes known the purpose of the arrest. KRS 503.090(1). *See also City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973) (holding officers "may use such force as may be necessary to make the arrest but no more." (citations omitted)).

Plaintiffs have done virtually nothing to substantiate these claims; tellingly, even when specifically instructed to supplementally brief these claims, Plaintiffs did not address the issue of assault whatsoever, and when discussing battery addressed only the facts potentially supporting Hartman's claim of battery; no mention was made of any facts suggesting battery as to either DeVries or Wallace. (Pls.' Supp. Br. 7-8). Defendants' motion for summary judgment will therefore be granted as to those claims. The Court need not even address the merits of Hartman's battery claim, as the Defendants are entitled to qualified official immunity on the same, as explained below.

### 2.    *Qualified Official Immunity*

Given that Kentucky law recognizes that officers are privileged under certain circumstances to use reasonable force to make an arrest, "[d]etermining the amount of force required to effect an arrest is a discretionary act."  *Castle v. Howard*, 2012 U.S. Dist. LEXIS 124143, *23 (E.D. Ky. Aug. 31, 2012) (citing *Woosley*, 591 F. Supp. 2d at 922).  Therefore, the burden shifts to Hartman to establish the act was not performed in good faith.  *Id.* at *22.  Bad faith requires a showing that the officers knew or should have known that their actions violated the plaintiff's rights, or that the officers willfully or maliciously intended to harm the plaintiff. *Yanero*, 65 S.W.3d at 523.

Hartman has offered no evidence to support either basis for liability.  His claim that the arresting officers' "intent was not to effectuate a lawful arrest, but rather deter [Hartman] from exercising his First Amendment rights, embarrass him, and inflict pain upon him[]" (Pls.' Supp. Br. 8) is not supported by any citations to the record, despite Hartman bearing the burden of proof.  *See Wicker v. Lawless*, 2017 U.S. Dist. LEXIS 162076, at *22-23 ("However, Plaintiff provides no examples with record citations, and the Court is not required to scour the record to find support for Plaintiff's Motion.") (citations omitted).  Defendants are therefore entitled to qualified immunity on Hartman's claim of battery.

### G.    <u>State Law Claim for Malicious Prosecution</u>[12]

Defendants have also moved for summary judgment on Plaintiffs' state-law malicious prosecution claim.  (Defs.' Mem. 48-49).

In Kentucky, a malicious prosecution action is established by showing five elements:

---

[12] Plaintiffs likewise attempted to further argue their claim of malicious prosecution in their Supplemental Brief; again, this attempt is rejected by the Court and will not be considered, as outside the scope of the briefing ordered.  (*See* Order, DN 28; Pls.' Supp. Br. 5-7).

1)      the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;

2)      the defendant acted without probable cause;

3)      the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;

4)      the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and

5)      the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016), *as corrected* (Sept. 22, 2016), *reh'g denied* (Feb. 16, 2017). Generally, actions for malicious prosecution are disfavored, as public policy favors the exposure of crimes, and sustaining actions for malicious prosecution in every case resulting in an acquittal or dismissal "would serve as a deterrent to the enforcement of the criminal law, since the prosecutor would hesitate to set the criminal law in motion if he was rendered liable for damages, unless the prosecution should be successful[.]" *Hunt v. Lawson*, No. 2007-SC-000438-DG, 2008 Ky. LEXIS 234, at *11-12 (Ky. Oct. 23, 2008) (quoting *Davis v. Brady*, 291 S.W. 412, 412-13 (Ky. 1927)). As "the tort of malicious prosecution is one that has not been favored in the law," a plaintiff "must strictly comply with the elements of the tort." *Prewitt v. Sexton*, 777 S.W.2d 891, 895 (Ky. 1989); *Davidson v. Castner-Knott Dry Goods Co.*, 202 S.W.3d 597, 602 (Ky. App. 2006).

Plaintiffs cannot strictly comply with the elements of malicious prosecution, as they have not established the absence of probable cause or the existence of malice. As to probable cause, given our sister court's recent prediction that Kentucky would adopt the *Devenpeck* holding regarding the existence of probable cause for *any* offense—not necessarily the specific offense identified as the basis for the arrest—the Court is satisfied that the same prediction applies with equal force to a claim of malicious prosecution as to a claim of false arrest. *See Warren*, 2017

U.S. Dist. LEXIS 104225, at *10-11, 16-17. It would be incongruous to hold an arrest was properly supported by probable cause, but then to apply a different standard to the citation's progression through prosecution.[13] As explained above, Defendants possessed adequate probable cause to arrest Plaintiffs, which necessarily defeats Plaintiffs' malicious prosecution claim as a requisite element.

Plaintiffs have likewise failed to establish that Defendants acted with malice. "As Kentucky's highest court held long ago, malice in the context of a malicious prosecution claim 'is the intentional doing of a wrongful act to the injury of another, with an evil or unlawful motive or purpose.'" *Sawyers v. Drummond*, No. 1:14-CV00111-GNS-HBB, 2017 U.S. Dist. LEXIS 6525, at *20-21 (W.D. Ky. Jan. 18, 2017) (quoting *Stearns Coal Co. v. Johnson*, 37 S.W.2d 38, 40-41 (Ky. 1931)). The malice element may be active, hostile, and demonstrable, or

---

[13] Although both this Court and the Eastern District have previously "predicted that the Kentucky Supreme Court would hold that a defendant initiating criminal proceedings on multiple charges is not necessarily insulated in a malicious prosecution case merely because the prosecution of one of the charges was justified[,]" those instances are readily distinguishable from the case *sub judice*. *Smith*, 93 F. Supp. 3d at 750 (citing *Martin v. Coyt*, No. 1:10-CV-00176, 2013 U.S. Dist. LEXIS 39374, at *12-13 (W.D. Ky. Sept. 21, 2012); *Carter v. Porter*, No. 5:08-CV-246-REW, 2011 U.S. Dist. LEXIS 20911, at *4-5 (E.D. Ky. Mar. 1, 2011)). Both *Smith* and *Martin* involved a personal or professional dispute between the plaintiff-arrestee(s) and defendant, where the defendant made a warrantless arrest of the plaintiff for multiple offenses, and there was at least some indication that the arrest was motivated by the underlying dispute. Such facts bear no relation to Plaintiffs' arrests here, made by Defendants as an active situation evolved. Further, in discussing the Eastern District's adoption of the holding from other circuits regarding malicious prosecution claims in the context of multiple charges, the court noted that the Third Circuit had distinguished between situations involving "a simultaneous arrest on multiple charges" in which the "significance of the charges for which there was not probable cause for arrest is limited" as opposed to those instances where "prosecution for multiple charges where the additional charges for which probable cause is absent almost surely will place an additional burden on the defendant." *Carter*, 2011 U.S. Dist. LEXIS 20911, at *25-27, n.13 (quoting *Johnson v. Knorr*, 477 F.3d at 84). As the *Johnson* case shows, this holding was designed to prevent law enforcement officers from "'tack[ing] on more serious, unfounded charges which would support a high bail or lengthy detention, knowing that the probable cause on the lesser offense would insulate him from liability for malicious prosecution on the other offenses.'" *Johnson*, 477 F.3d at 83 (quoting *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991)). This situation is clearly not present in the case at bar.

it "can be inferred from lack of probable cause."  *Sweeny v. Howard*, 447 S.W.2d 865, 866 (Ky. 1969); *Phat's Bar & Grill*, 918 F. Supp. 2d at 665 (quoting *Massey v. McKinley*, 690 S.W.2d 131, 134 (Ky. 1985)).  Plaintiffs have not cited any evidence in the record tending to show Defendants were actively, hostilely, or demonstrably malicious in arresting Plaintiffs.  As the Court has determined the existence of probable cause, Plaintiffs have thus failed to establish the existence of malice under either method.

"Police officers are constantly making arrests in high pressure situations and as a matter of public policy should not be required to make fine, legal distinctions on the spur of the moment under these conditions."  *Myers v. Louisville*, 590 S.W.2d 348, 349 (Ky. App. 1979).  The Court agrees, and finds Defendants are entitled to summary judgment as a matter of law under the circumstances presented here.

## V.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (DN 17) is **GRANTED**.  Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

**Greg N. Stivers, Judge**
**United States District Court**
February 6, 2018

cc:     counsel of record